WARREN & OUACHITA VALLEY RAILWAY COMPANY *v.* WALDROP.

Opinion delivered December 20, 1909.

1. COSTS—BOND—NON-RESIDENT ADMINISTRATRIX.—Kirby's Digest, § § 959-961, requiring that a nonresident plaintiff shall give a bond for costs, has no application to a nonresident who sues as administratrix. (Page 136.)

2. ADMINISTRATION—REMOVAL FROM STATE.—The removal of an administratrix from the State does not, of itself, operate to revoke her letters of administration. (Page 138.)

3. INSTRUCTION—SPECIFIC OBJECTION.—An instruction upon the measure of the damages of a widow by reason of the killing of her husband, which failed to limit her right to recover to her probable expectancy of life, was not erroneous if she appeared before the jury, so that they could judge of her probable expectancy, and if no specific objection was taken to the instruction on this ground. (Page 139.)

4. MASTER AND SERVANT—DUTY TO KEEP LOOKOUT—NEGLIGENCE.—Where it was a question whether an engineer, in backing his engine, was negligent in failing to keep a lookout, whereby plaintiff's intestate was killed, a charge that if the engineer was negligent in failing to keep a lookout, and such failure was the cause of decedent's injury, and he was free from negligence, plaintiff should recover, was not prejudicial where the court further instructed the jury that it was the engineer's duty to keep only such a lookout as was consistent with the performance of his duties in holding his engine, and that a necessary momentary failure to keep such lookout was not negligence. (Page 139.)

5. DEATH—DAMAGES.—A railroad brakeman was killed at a time when he was earning $60 a month, with a promising future, at the age of 33; his body was mangled, and he suffered excruciating pain, and lingered for five days, having been conscious during that period; he was childless, and was in the habit of turning over to his wife his entire salary. *Held,* that a verdict of $8,000 for his widow and $2,000 for his estate was not excessive. (Page 140.)

Appeal from Bradley Circuit Court; *J. G. Williamson,* Special Judge; affirmed.

STATEMENT BY THE COURT.

G. A. Waldrop was thirty-three years of age on February 22, 1908. He had been married a year, and was on the date mentioned acting as a brakeman for appellant, earning a salary of $60 a month. He had previously been acting as conductor at a salary of $90 a month. He was regarded as a first-class railroad man, and had a promising future before him. He and his wife lived at Warren, and they had no children. His next of kin were his father and mother. On the date mentioned G. A. Waldrop was killed while in the employ of appellant, and in the performance of his duties. He was run over by the cars of appellant, his body mangled, and he died five days later as the result of his injuries, having endured excruciating agony from the time of his injury until the time of his death, and having been conscious during all of this period. His widow was appointed administratrix of his estate by the probate court of Bradley County, and brought suit against the defendant railroad company as administratrix for the benefit of the widow and estate.

She alleged: "That, while engaged in the performance of his duties, deceased uncoupled from the train one freight car, which was intended to be left on the siding; that, immediately after uncoupling the said cars, the deceased signaled to the engineer in charge of the said engine to pull the remainder of the train west, and after giving said signal the deceased then went back east to the end of the car connecting with the baggage car, which was left standing on the track for the purpose of connecting the air hose between the baggage car and the box car which was left on the track, in order to have everything in readiness for the engineer to perform his duty by moving the engine west in obedience to the signal, and the deceased proceeded to couple said air hose; while in this position between the cars, the engineer, in violation of the signals given to him, started the engine east with great force, causing cars to knock the deceased down and run over him."

Then follow allegations of the injury, pain, conscious suffering and death as the result; also of the amount that Waldrup

was earning and the amount he contributed to his widow, with a prayer for $20,000 for the benefit of his estate and $30,000 for the benefit of his widow and next of kin. Appellant answered, denying all the material allegations and pleading contributory negligence, stating that the deceased had no right to go in between the cars without advising the engineer in advance as to his intention to do so or without giving the usual stop signal.

The facts are substantially as follows: On the day of the accident two coaches were placed on a side-track at appellant's station at Warren, Arkansas. These coaches, a passenger and baggage or express, were to go out in the train from Warren that afternoon. The train was being made up for its departure. The side-track on which the coaches were placed was on a down grade of about one per cent. towards the depot, and the brakes were set on these two cars, so that they would not move down the grade. Three freight cars were attached to the engine. One of these cars was to be weighed and returned and attached to the two coaches, and the other two freight cars were to be taken and delivered to the Iron Mountain railway upon a connecting track between that road and appellant. The freight car was weighed, and the engine had backed it down, and it was coupled on to the two coaches that were on the side-track. When the engine started out with the two remaining freight cars attached to it to deliver to the other road, it stopped to take slack, or else backed after starting without warning, and the injury to Waldrop occurred. One witness for appellee testified that it occurred as follows:

"The engine was bringing the box-car back, setting it in on that spur to be connected with the express car. They uncoupled from the box-car, and pulled up, leaving the box-car standing attached to the baggage car, while they started forward with two or three cars. I was standing on the north side of the track. I saw Waldrop go in between the cars for the purpose of coupling air. I did not see him give any signals to the engineer. The engine was up on the west end of the spur. I saw it had pulled up a little just at the time he went in there. I never noticed him looking toward the engine before going in between the cars. He might have signaled, and I not noticed them, as I do not understand railroad signals, but at the time the engine started I

noticed him go in between the cars for the purpose of coupling air. He went in between the box-car and the baggage car, and after he went in the engine moved back. I could not tell you how far the engine had pulled the detached cars west before it backed, and I would not undertake to say how far it went. It might have been five or six feet or more, but in a few seconds after it started I heard it bump back and the cars bumped together. It sounded to me just like a railroad train sounds when the engine backs and is taking up slack. That is what I thought they were doing."

This witness was asked how much space there was between the two cars when it started back, and answered that it might have been half a car. He said that he could see that there was space between the cars, but he could not tell with anything like definiteness the distance between the cars. When asked whether it was two, three, four, five or six feet, he answered that it must have been more than two feet. He says he was standing about thirty steps from the track, and hardly a car length down the track from where the cars came together. When he looked at the cars from the angle he was standing, it was done so quickly he could not tell how much space of light he could see between them. "It was so quick he could not tell anything about it." He "could see an opening, and that was all he could tell." Another witness on behalf of appellee testified that he was standing about one hundred yards from Waldrop at the time of the accident. He was at a place directly ahead of the engine and on the opposite side of the track from Waldrop. He thought he noticed the engine go forward after they had struck the other cars, and it stopped. They only went forward very little; after the engine came forward it went back. He had seen the operation gone through with very often before that time, had seen Mr. Waldrop at other times couple the air hose before leaving it. It was necessary to go in between the cars to couple the air hose, and it was necessary for him to stoop over in order to make the coupling.

Witness Smithy, who was the other brakeman, testified for appellant substantially as follows: "George (Waldrop) and I were standing there talking, and I pulled the pin, and George gave the signal with his right hand to go ahead, and the engine

went ahead one, two or three feet, as near as I could tell, and then he took the slack, and when he had taken the slack I still held the lever. By taking the slack I mean he backed up to get the slack, so he could go ahead. When he backed up to take slack, the cars came back and hit the car that had been cut off, causing it to roll back a half-car length, or a car length. The car that was attached to the engine came back nearly three or four feet. The last I saw of George before the accident, he was standing opposite the car where I cut off, talking to me. I was on the south side of the track, and he was on the north side, opposite the opening between the car we were leaving attached to the baggage car and the two head cars that we carried out. I had hold of the lever that pulls the pin to uncouple the cars, and kept hold of it to keep the cars from coupling when he took the slack, so he could go on out. I expected that slack would be taken, and took hold of that lever to keep the pin from dropping back and making a coupling. I saw George turn around to go towards the rear end of the train, and he passed out of the line of my vision. The next I saw of him was after he was hurt, lying under the car. No one, besides George Waldrop, as far as I saw, gave any signal to the engineer. I have been in the railroad business operating trains about three years as a brakeman. The brakemen are the ones who do nearly all of the signal giving. When a brakeman gives the signal to go head, he expects that the engineer, if he cannot start his train on the first attempt, and finds it necessary to take slack, will take slack without any further signal being given. I went to George Waldrop when he was hurt, and helped take him out from under the car and lay him on some cross-ties. He said at the time that it was his own fault, his own carelessness.

"It was not the custom to couple up the air hose at the time the cars were set in. I had never seen Waldrop do that before. Waldrop was an experienced railroad man. When Waldrop gave the signal to go ahead to the engineer, the engineer responded to it as quick as he could, and moved forward two feet or two and a half feet, and then came back to take the slack. The engineer gave no warning that he was coming back. The track was up grade the way the engine was headed, and he came back to take slack; I mean by that to get the play between the cars.

There is not quite a foot of play between those cars. If he only had one car, he could take up all the slack by backing one foot. There were two cars behind this engine. The brakes were set on these cars and on the passenger cars to hold them from running down hill. The brakes were set just enough to keep the cars from rolling down by their own weight. . When the train came back, it knocked these three cars with the brakes set on them a car length. When I went to Waldrop, after the accident, he was lying about under the second wheels. His shoulders were within about six inches of the second wheels. The first trucks had passed over him."

The engineer, on behalf of appellant, testified: "After we had backed in and stopped, I got the signal to go ahead. I tried to go ahead, but failed to pull the cars. We had hold of three cars. We were figuring on leaving one on that track. I got the signal to go ahead, and started ahead, but the engine failed to pull the cars, and I reversed the engine to try to pull them again, and as I started them the second time I saw Mr. Brewer flagging me. Thinking there was some trouble, I put on the brake. The other brakeman, Smithy, then came across the track to the engine, and told me that George was hurt. I then went to him, and found that one end of the car had run over him and cut off his right arm. When I started to pull the cars ahead in response to the signal, I started off easy, and gave the engine steam, but it would not go, and I could not pull the cars, so I threw the engine in back motion to throw it the other way, in order to get it so it would roll, as it is customary to keep on trying to go until you get signals to stop. So that was the reason I reversed the engine, to get the engine and cars in a different position, so they would roll. In railroad parlance, we call it 'taking slack.' Mr. Waldrop was on the north side of the track at the time he gave me the signal to go ahead. In turning the reverse lever for the purpose of putting the engine in back motion I had to face the fireman's side, and in that position I could not see anything on the north side of the track. The 'go-ahead' signal was given me by Mr. Waldrop himself. It takes both hands to throw the reverse lever, if there is steam in the cylinder. The reason the engine could not pull the cars the first time I started them was because the brakes were set on the cars, and the engine got on the

center. The engine will not pull anything much when it is on the center. When the engine gets on the center, it is the duty of the engineer, and customary always, to reverse it and take the slack, and get the engine in a different position; where he can get more out of it than the way it was standing at first. When the engineer gets the signal to go ahead, and finds that the engine won't go, it is the rule among railroad men to reverse and take slack without giving or receiving any further signals. I asked Waldrop how he came to get hurt, and he told me he was coupling the air hose.

"When the engine is standing still, and the engineer wants to back up, the usual signal is to ring the bell or blow the whistle, to let the crew know he intends to move the engine, so, if they are in the way, they can get out. It is the duty of the engineer to be on the lookout for the trainmen. The two cars which were attached to the engine were loaded with lumber. When I started forward the first time, I did not start with as much steam as it took to pull them out; and when I found it took more, I had to back up and take the slack. I do not remember just how hard I went back against the freight cars. It was not so very hard and not so very easy, of course. When I reversed the engine for the purpose of going back to take up the slack, I did not open the throttle. The steam that was already in the cylinders, that I had thrown in there to go ahead, made the engine go back."

It was shown that the engine was a good one, had immense horse power, and could move thirty cars on a level. Many experienced railroad men were introduced, and testified as experts. They showed what the custom was in "taking slack;" that when an engineer received a signal to go ahead and found that the engine could not pull the train, it was necessary for him to "take slack," and it was not customary for him to give a signal that he was going to do so. A movement of a few inches would take up the slack in two cars; about eighteen inches would take up the slack in two cars.

One of the engineers testified: "The locomotive engines are built with the piston rods on the quarter on each side, so that if the engine stops with one exactly 'on the quarter,' the one on the other side would be exactly 'on the center.' If the slack is all taken up when the train stops, and the engine stops

with one of its cylinders on the dead center, there would be only one cylinder to take steam to start with. The engineer, not knowing the position of the cylinders and starting to pull out, would find that the engine did not start, and would naturally reverse the engine, which would drop the weight of the engine back against the tender, the tender back against the car behind it, and so on back until it took the slack up, so he would have both of the engines in connection to start with, so that, after he took the slack, both cylinders would take steam. Before taking the slack, the engine would have to start pulling all the cars, but, after taking slack, it would only have to start its own weight, and the others would follow.

In certain positions of the cylinders the engine might start ahead just far enough to take up the slack in the train, and then stop on the center. If that would happen, the engineer would have to reverse the engine and take slack before he could go ahead again.

In practical railroad work the taking of the slack is something that might be expected to happen at almost any time, and in prudent good railroading train operatives take into consideration the fact that slack is apt to be taken at any time in conducting their movements about the train.

This expert on cross examination testified as follows:

"When the cylinder on one side is on the dead center, the one on the other side has the maximum of power, which is just one-half the power of the engine. An engine with one side on the center, on level track, with the slack all out of the train, may be able to start three or four cars under ordinary circumstances. If the slack was not taken up, and the engine could get the advantage of the slack, she could probably start her usual load, which would be about thirty cars. If an engine had two cars on it, and should run ahead as much as half a car length, I do not think there would be any need of taking slack because the engine would have gained all the benefit it could if it went ahead half a car length. If the engine had two cars on it, and ran forward half a car length, and then backed half a car length, I would think it was an extraordinary way for an engine to act, though it might act that way on account of the reverse lever throwing the engine over. It might have happened that the en-

gine got away from the engineer for just a second. I have had
experiences of that kind in trying to move a car.. I would give
the reverse lever a turn, and it would get away from me, and I
would go up and hit the car harder than I had intended to hit it.
This would happen from some little unguarded point in the en-
gine that you couldn't control, and it would not show that there
was anything wrong with the machinery.

"If an engine moves forward a few feet, and stops of her
own motion, without the engineer shutting off the steam or try-
ing to stop it, then it would be necessary to take slack in order to
get a start. When the engine, under such conditions, is re-
versed for the purpose of taking up the slack, if she comes back
without opening the throttle to turn on the steam, it is the steam
already in the cylinders and dry pipes that moves her back. The
engineer has no control over the amount of that steam; and when
she comes back, she has to come back with all the force in that
steam, and is likely to jam against the cars behind."

Other expert witnesses testified that if the engine moved
forward as much as a half-car length there could be no occa-
sion to "take slack."

Mrs. Waldrop, the appellee, testified that at the time of her
husband's injury he was receiving a salary of sixty dollars per
month, which he turned over to her, and she paid all the ex-
penses of the family.

After several witnesses for appellant had been examined,
it "moved the court to require the plaintiff to give bond for the
costs of the action, on the ground that the plaintiff was a non-
resident of the State of Arkansas, and asked that the action be
abated until such bond be given; but the court refused said mo-
tion, and allowed the action to proceed. To said ruling of the
court the defendant duly saved its exception.

The jury returned a verdict for plaintiff, assessing her dam-
ages for her pecuniary loss at $8,000, and the damage to the
estate at $2,000. Other facts stated in opinion.

*Austin & Danaher* and *Purcell & Bradham* for appellant.

Defendant's motion to require plaintiff to give bond for costs
should have been sustained. Kirby's Digest, §§ 959, 960, 961,
2 Ark. 109. Where there is no evidence to support the verdict,
the jury should be so instructed. 120 S. W. 984; 65 Ark. 429; 63

Ark. 177. The party should have used more than ordinary care for his own safety. 51 Ark. 467. The verdict was excessive. 77 Ark. 405.

*Goodwin & McHaney* and *Rose, Hemingway, Cantrell & Loughborough,* for appellee.

When an injury is shown to have been sustained in the operation of a train, or by the train while in operation, there is a *prima facie* case against the railroad company. 88 Ark. 207; 87 Ark. 308. The employees in the yard must keep a lookout, as well as those engaged in the operation of trains. 83 Ark. 61; 80 Ark. 528; 88 Ark. 207; 78 Ark. 22; 80 Ark. 535.

WOOD, J., (after stating the facts). First. Unless the engineer was "taking slack," as explained in the evidence, he was negligent in backing the cars over Waldrop. For the evidence shows that, in order to move back after his train had started forward (unless he was merely taking slack), it was his duty "to get the consent of the crew," as one of the witnesses expressed it. Where he is not "taking slack," he should not move back without a signal. He should give the "back-up" signal, consisting of three short blasts of the whistle, the purpose of which was a warning to the crew. It was also the duty of the engineer to keep a lookout for the safety of his co-employees, if for any purpose other than "taking slack" he moved his engine back after having first started same forward. *Little Rock & H. S. W. Rd. Co. v. McQueeny,* 78 Ark. 22; *Kansas City So. Ry. Co. v. Morris,* 80 Ark. 528; *St. Louis, I. M. & S. Ry. Co. v. Standifer,* 81 Ark. 278; *St. Louis S. W. Ry. Co. v. Graham,* 83 Ark. 61; *St. Louis, I. M. & S. Ry. Co. v. Puckett,* 88 Ark. 207.

Appellant concedes that none of these precautions were taken, and for the reason it contends that the train was not backed except for the purpose of "taking slack." Therefore, the negligence of appellant is established if the evidence is sufficient to show that the engineer was not "taking slack." On the other hand, if he was "taking slack," the appellant was not negligent and is not liable. It has been a very close question with us to determine whether or not the evidence was sufficient to warrant a finding that the engineer at the time he backed the cars down upon Waldrop was "taking slack." We have finally reached the conclusion that the evidence, the material parts of which we have

set forth at length in the statement, was sufficient to warrant the verdict. The jury might have found that the engineer had moved the two cars, to which his engine was attached, a greater distance than was necessary for "taking slack" before he commenced to back them. The testimony of the witnesses for appellee, giving it its strongest probative force in her favor, tended to show this. After the engine started forward, Waldrop had time to go the entire length of a car, to go between them and to stoop over to connect the air hose before the cars came back upon him, tending to show that the engine must have gone forward more than a very few feet.

While the witnesses could not tell in feet the length of space the cars went forward, and did not undertake to estimate it because it was done so quickly, yet one of them who stood to one side said that it must have been more than two feet, and might have been "a half-car length." He remembered seeing the "light space," and he was standing about forty or forty-five feet ("hardly a car length") from where the cars came together, and down the track in the direction they started, and about thirty yards away. While he says he thought they were "taking slack," he describes the forward movement and the "light space," and gives the jury room to conclude from his testimony that the cars "might have gone forward as much as half a car length." The other witness, who stood some one hundred yards directly in front of the train, saw the engine, he thought, go forward and stop. He says it came a very little distance toward him before it stopped; then it went back. In view of evidence in the record to the effect that only eighteen inches backward movement would be sufficient to take up all the slack in the two cars, the jury were warranted in finding from the above evidence that the engineer had moved his train forward a sufficient space to give it momentum and to make the "taking of slack" unnecessary, and that when he stopped his engine after starting same forward, and then backed same, this latter movement was not necessary for the "taking of slack," whatever else might have been its purpose. The jury might also have found that the backward movement was not "taking slack" because the impact with the two coaches caused them to move about a car length, dragging the body of Waldrop and finally running over and crushing his arm. This,

too, notwithstanding the brakes were set loosely to keep these coaches from moving of their own weight down the track. That the mere "taking of slack" would not have caused this unless the engineer had lost control of his engine, of which there is no evidence. There was testimony in the record by the witnesses for the appellant, experts, that warranted the jury in concluding that an engine of the size and in the condition of the one under consideration could move always (barring accidents) from a dead stop at least as many cars as were attached to his engine. If the engine had moved forward as much as a half-car length, as the jury might have found under all the evidence, then, according to practically all the testimony of the experts, it was wholly unnecessary to stop the engine and to "take slack." Having gone that far forward, the train would continue to move in that direction unless stopped and set in motion in the opposite direction for some other purpose than "taking slack." It could not be useful to farther discuss the evidence. It suffices to say that it was a question of fact for the jury as to whether appellant was negligent in the manner alleged in the complaint. It was also a jury question as to whether Waldrop was guilty of contributory negligence. These questions were submitted upon correct instructions.

Second. The court did not err in refusing to abate the action until appellee should give bond for costs. Sections 959, 960. 961, Kirby's Digest, do not apply to an administratrix in this State* She had given a bond as administratrix, and she was not liable personally for costs in a suit brought in her fiduciary ca-

---

*Sections 959, 960 and 961 of Kirby's Digest read as follows:

"959. A plaintiff who is a non-resident of this State, or a corporation other than a bank created by the laws of this State, before commencing an action shall in the clerk's office file a bond, with sufficient surety, to be approved by the clerk, for the payment of all costs which may accrue in the action in the court in which it is brought, or in any other to which it may be carried, either to the defendant, or to the officers of the courts.

"960. An action in which a bond for costs is required by the last section, and has not been given, shall be dismissed on the motion of the defendant at any time before judgment, unless in a reasonable time to be allowed by the court after the motion is made therefor such bond is filed, securing all past and future costs; and the action shall not be dismissed or abated if a bond for costs is given in such time as the court may allow.

"961. If the plaintiff in an action, after its institution, becomes a non-resident of this State, he shall give security for costs in the manner and under the restrictions provided in the preceding sections of this chapter."

pacity.   See by analogy *Johnson* v. *Duval,* 27 Ark. 599; *Tucker* v. *West,* 31 Ark. 647.   The removal of appellee to Missouri did not, *ipso facto,* revoke her letters as administratrix.   The probate court had not revoked her letters, and the fiduciary status in which she sued she still retained in Arkansas.   *McCrary* v. *Taylor,* 38 Ark. 393.

Third.   There was no prejudicial error in giving appellee's fifth prayer.† Appellee was before the jury.   They could judge of her probable expectancy from her appearance.   If the instruction was defective in omitting this idea, the appellant could, and should, have reached it by specific objection.   Appellant in a separate prayer should have presented this feature if it intended to insist on it here.   It is difficult to conceive that a sensible jury would make an allowance to extend beyond the time when the beneficiary of such allowance would probably be dead.   They were to find, under the instruction, the amount he would have contributed to her, and of course he could not have contributed to her after she was dead.   The instruction is not like that condemned in *Fordyce* v. *McCants,* 51 Ark. 509.

There was no prejudicial error in giving appellee's prayer number eight.‡ This prayer must be considered in connection

---

†Appellee's fifth prayer, which was given by the court, was as follows:
"5.  If you find for the plaintiff you will assess the damages at such amount as will fairly compensate deceased's widow and estate for such damages as is shown by the proof to have been sustained by each, if any, caused by the injury and death of G. A. Waldrop, allowing the widow such amount of pecuniary damage as she has suffered, if any, by reason of the injury and death of her husband, basing such damages on the present value of the amount that in your judgment deceased would have contributed to the support and well-being of his wife during his lifetime, having regard to the probable duration of his life, the amount he has customarily contributed to the support and well-being of his wife, if anything, and what, in your judgment, he would have contributed to her during the remainder of his life but for the accident causing his death, taking into consideration the age, health, habits, expectation of life, mental and physical capacity for and disposition to labor, and the probable increase or diminution of that ability with the lapse of time, his earning power and rate of wages, and you will award his estate such amount of damage as will fairly compensate for the mental and physical pain and suffering endured by the deceased, if any, between the time of his injury and the time of his death."

‡Appellee's prayer number 8, given by the court, was as follows:
"8.  If you find from the evidence that the engineer was guilty of negligence in failing to keep a lookout when he backed his engine, and such failure, if any, was the proximate cause of the injury to the deceased, and deceased was free from contributory negligence, your verdict will be for the plaintiff."

with appellant's prayer number eight.§  The two instructions correctly declared the law applicable to the evidence in the case. It is undisputed that the engineer did not have to keep a lookout if he was only "taking slack." The instruction could only have referred to his duty if he was backing his engine for some other purpose.

Fourth. The verdict was not excessive. This case is unlike the case of *St. Louis, I. M. & S. Ry. Co.* v. *Caraway,* 77 Ark. 405, where the court held the verdict excessive, because there was no evidence in that case to show the amount that the deceased in his lifetime had contributed to his wife.

Here the evidence shows the amount, and, when the jury considered, as they must have done, the probable increase in the earning power of one who was in the line of promotion, and who from his character and habits would deserve it, we are of the opinion that the verdict under the evidence was not excessive.

The judgment is therefore affirmed.

§Appellant's prayer number 8, given by the court, was as follows:
"8.  While it was the duty of the engineer to keep a lookout, the law only requires him to keep such a lookout as is consistent with the performance of his duties in handling the engine. If it was necessary for him to turn around and thus momentarily prevent him from keeping a lookout, the company cannot be held guilty of negligence on account of such momentary failure to keep a lookout."